**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>Penobscot Valley Hospital,<br><br>    Debtor | Chapter 11<br>Case No. 19-10034 |
| Penobscot Valley Hospital,<br><br>     Plaintiff<br>  v.<br><br>Jovita Carranza, in her capacity as Administrator for the United States Small Business Administration,<br><br>    Defendant | Adv. Proc. No. 20-1005 |
| In re:<br><br>Calais Regional Hospital,<br><br>    Debtor | Chapter 11<br>Case No. 19-10486 |
| Calais Regional Hospital,<br><br>     Plaintiff<br>  v.<br><br>Jovita Carranza, in her capacity as Administrator for the United States Small Business Administration,<br><br>    Defendant | Adv. Proc. No. 20-1006 |

**ADDITIONAL PROPOSED FINDINGS AND CONCLUSIONS**

All litigation under the Administrative Procedures Act implicates separation of powers questions, and these lawsuits provide no exception. The power to implement statutes is delegated by Congress to agencies, not to courts, because agencies have several comparative

advantages in making policy judgments.  *See* <u>Kisor v. Wilkie</u>, 139 S. Ct. 2400, 2413 (2019).

Unlike courts, agencies are politically accountable: "they are subject to the supervision of the

President, who in turn answers to the public."  <u>Id.</u>  Congress delegates legislative authority

explicitly in some circumstances and implicitly in others.  <u>United States v. Mead Corp.</u>, 533 U.S.

218, 229 (2001).  Implicit delegation may occur, as it has here, where it is "apparent from the

agency's generally conferred authority and other statutory circumstances that Congress would

expect the agency to be able to speak with the force of law when it . . . fills a space in the enacted

law[.]"  <u>Id.</u>

These proceedings concern a rule adopted by the Small Business Administration ("SBA")

excluding debtors in bankruptcy from participating in the Paycheck Protection Program (the

"PPP").  The plaintiffs—Penobscot Valley Hospital and Calais Regional Hospital (the

"Hospitals")—have consistently asked this Court to cast aside the SBA's rule and declare them

eligible to participate in the PPP.  The arguments advanced in support of this remedy have

evolved over time.  What began as a challenge to the SBA's authority to implement the

bankruptcy exclusion, coupled with a claim of unlawful discrimination under 11 U.S.C. § 525,

has morphed into an argument that the SBA ran afoul of the procedures outlined in the

Administrative Procedures Act ("APA").  Although the Hospitals make detailed arguments under

the rubric of the APA on recommittal, their fundamental grievance is what it always has been:

they challenge the wisdom of the bankruptcy exclusion and ask the Court to substitute their

policy preference for the SBA's.  But it is not for the Judiciary to second-guess a reasonable rule

promulgated by an agency in the exercise of the authority delegated by Congress.  As such, the

Hospitals' challenge must fail.  *See* <u>Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467

U.S. 837, 866 (1984) ("When a challenge to an agency construction of a statutory provision,

fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail.").

## I.    PROCEDURAL BACKGROUND

These proceedings began on April 27, 2020.  Due to the time-sensitive nature of the relief sought by the Hospitals, the Court conducted an expedited trial on May 27 and issued proposed findings and conclusions one week later.  Following an objection from the Hospitals under Fed. R. Bankr. P. 9033(b), proceedings commenced in the District Court.  With its response to that objection, the SBA filed a declaration that had not been offered in evidence during the trial.  The District Court adopted and accepted, in part, this Court's proposed findings and conclusions.  The proceedings were then recommitted to this Court for consideration of certain questions, including the significance of the declaration filed by the SBA.

After recommittal, the Hospitals were granted the opportunity to conduct limited discovery.  Based on representations from the Hospitals about the nature and extent of discovery necessary, the Court allowed a discovery period of approximately six weeks.  The parties were instructed to contact the Court upon completion of discovery to schedule a further hearing.  After several months, the Court convened a status conference and learned that the parties were mired in a discovery dispute.  The Court then issued an order resolving that dispute and entertained oral arguments from the parties.

The District Court recommitted a particular aspect of these proceedings to this Court for further consideration—namely, the proposed conclusion that the bankruptcy exclusion is within the bounds of a reasonable interpretation of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020).  Specifically, this Court is tasked with: (i) resolving the "possible discrepancy" [Dkt. No. 78, p. 6] between the declaration

filed with the District Court (the "Maine Miller Declaration") and another declaration filed in

similar litigation in Vermont (the "Vermont Miller Declaration"); (ii) determining whether the

bankruptcy exclusion is a reasonable construction of the CARES Act under the second step of

the analysis articulated in <u>Chevron</u>; and (iii) determining whether the bankruptcy exclusion is

"arbitrary and capricious" under the standard established in <u>Motor Vehicle Mfrs. Ass'n of the

U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983).

## II.    PROPOSED FINDINGS AND CONCLUSIONS

To the extent that the District Court adopted and accepted the proposed findings and

conclusions issued previously, those findings and conclusions are fully incorporated here.

Despite that incorporation, certain information contained in the initial findings and conclusions

may be reproduced here for the ease of the reader.  Before completing the tasks assigned on

recommittal, an orientation is in order, starting with the authority conferred upon the SBA in

relation to loans under Section 7(a) of the Small Business Act, canvassing the pertinent

provisions of the PPP, tracking through the promulgation of the bankruptcy exclusion, and

concluding with a review of the two Miller declarations.[1]

### A.  The Small Business Administration and Section 7(a) Loans Generally

Because Congress tasked the SBA with administering the PPP under a loan program

that was in place long before the passage of the CARES Act, "understanding the SBA's

functions and that pre-existing loan program helps put the issues in context."  <u>USF Fed. Credit

Union v. Gateway Radiology Consultants, P.A. (In re Gateway Radiology Consultants, P.A.)</u>, ---

---

[1]  On recommittal, the Hospitals asked this Court to make additional proposed findings, a number of which straddle or even cross the (sometimes but not always blurry) line separating factual findings from legal conclusions.  To the extent that the factual record and the law permit, the Court has made the findings and conclusions requested, and incorporated them below.  To the extent that the requested findings and conclusions do not appear below, they lack merit as a matter of law or lack support in the record, as applicable, and the Court therefore declines to make them.

F.3d ---, 2020 WL 7579338, at *2 (11th Cir. Dec. 22, 2020).  When it passed the Small Business

Act of 1953 (codified as amended at 15 U.S.C. §§ 631-657), Congress declared that "the

Government should aid, counsel, assist, and protect insofar as is possible the interests of small-

business concerns in order to preserve free competitive enterprise . . . and to maintain and

strengthen the overall economy of the Nation."  15 U.S.C. § 631(a).  To carry out these policies,

Congress created the SBA, an agency that would serve "under the general direction and

supervision of the President[,]" 15 U.S.C. § 633(a), and vested management of the SBA in a

single Administrator, to be "appointed from civilian life by the President, by and with the advice

and consent of the Senate," id. § 633(b)(1).  "The Administration was given extraordinarily

broad powers to accomplish [its] important objectives, including that of lending money to small

businesses whenever they could not get necessary loans on reasonable terms from private

lenders."  SBA v. McClellan, 364 U.S. 446, 447 (1960) (footnote omitted).

Section 7(a) of the Small Business Act empowers the SBA to make loans to small

businesses directly or indirectly—through loan guarantees—"to the extent and in such amounts

as provided . . . in appropriation Acts[.]"  15 U.S.C. § 636(a).  When it comes to these loans,

commonly known as Section 7(a) loans, the Administrator has expansive rulemaking authority.

The Administrator is generally empowered to "make such rules and regulations as [she] deems

necessary to carry out the authority vested in [her,]" 15 U.S.C. § 634(b)(6), and to "take any and

all actions . . . when [she] determines such actions are necessary or desirable in making . . . or

otherwise dealing with or realizing on loans[,] id. § 634(b)(7).  The Administrator also serves on

the Loan Policy Board of the SBA, along with the Secretary of Treasury and the Secretary of

Commerce, and in that capacity establishes:

> general policies (particularly with reference to the public interest involved in the
> granting and denial of applications for financial assistance by the Administration

and with reference to the coordination of the functions of the Administration with other activities and policies of the Government), which shall govern the granting and denial of applications for financial assistance by the Administration.

15 U.S.C. § 633(d).

In the exercise of its authority to lend under Section 7(a) and to make rules and policies for such lending, the SBA is constrained and guided by the terms of the statute. Among those terms is the requirement that Section 7(a) loans "shall be of such sound value or so secured as reasonably to assure repayment[.]" 15 U.S.C. § 636(a)(6). To ensure that a loan will be "so sound as to reasonably assure repayment[,]" the SBA's lending criteria involve consideration of nine factors, including the applicant's credit history. 13 C.F.R. § 120.150. For Section 7(a) loans, the SBA also considers an applicant's bankruptcy history; applicants are asked to disclose prior bankruptcy filings on Form 1919, the loan application form.

### B. The Paycheck Protection Program

The CARES Act became law on March 27, 2020, creating the PPP and nestling it within the existing Section 7(a) framework. *See* Pub. L. No. 116-136, § 1102(a), 134 Stat. 281, 286. As its name suggests, the PPP was designed to keep American workers on payrolls despite the economic impacts of COVID-19. To achieve this objective, the PPP authorized small business loans that would qualify for forgiveness if used to fund specific expenses, including payroll costs, during a defined period. *See* Pub. L. No. 116-136, § 1106(b), 134 Stat. 281, 298.

For PPP loans, the CARES Act amended Section 7(a) of the Small Business Act, 15 U.S.C. § 636(a), in a number of ways, but left other aspects of Section 7(a) in place. Most provisions relating to the PPP were located in a new paragraph at the end of 15 U.S.C. § 636(a). *See* Pub. L. No. 116-136, § 1102(a)(2), 134 Stat. 281, 286. Except as otherwise set forth in that new paragraph—number (36)—Congress provided that "the Administrator may guarantee [PPP]

loans under the same terms, conditions, and processes as a loan made under this subsection"—

i.e., subsection (a) of 15 U.S.C. § 636.  *See* Pub. L. No. 116-136, § 1102(a)(2), 134. Stat. 281,

287 (codified at 15 U.S.C. § 636(a)(36)(B)).  By enacting 15 U.S.C. § 636(a)(36), Congress

deviated from some of the terms applicable to other loans made under Section 7(a).  *See, e.g.,* 15

U.S.C. § 636(a)(36)(D), (J).  But Congress did not suspend for PPP loans the "sound value"

requirement generally applicable to Section 7(a) loans under 15 U.S.C. § 636(a)(6).

Although PPP loans were designed to incentivize borrower behavior—i.e., use of the

loans to fund payroll and other specified expenses—Congress also contemplated that the loans

might not be so used, and might not be forgiven.  Either way, the SBA would have some part to

play.  To the extent that a PPP borrower qualifies for loan forgiveness, the SBA is on the hook to

the lender for the amount forgiven, plus accrued interest.  *See* 15 U.S.C. § 9005(c)(3).  Any

portion of a PPP loan not forgiven must be repaid, *see* 15 U.S.C. § 636(a)(36)(K)(ii)

(establishing, for unforgiven PPP loans, a minimum maturity of five years and a maximum

maturity of ten years from the date of an application for forgiveness), and if the borrower does

not pay the lender, the SBA remains on the hook because the SBA guarantees 100% of loans

issued under the PPP, *see* id. § 636(a)(2)(F) (providing that the SBA is to "participate in"—or

guarantee—100% of PPP loans); id. § 636(a)(36)(K)(i) (indicating that unforgiven PPP loan

balances "shall continue to be guaranteed by the Administration").

Congress appropriated a very large, but not unlimited, amount of money for the PPP:

$349 billion.  *See* Pub. L. No. 116-136, § 1107(a)(1), 134 Stat. 281, 301.  The legislature

communicated a sense that these funds be disbursed quickly.  The statute contained time

constraints relating to the loans themselves:  only "covered loans" would be eligible for

forgiveness, and covered loans could only be obtained during the "covered period" ending on

June 30, 2020.  *See* Pub. L. 116-136, § 1102(a)(2), 134 Stat. 281, 286; Pub. L. 116-136, § 1106,

134 Stat. 281, 298.[2]  Congress also granted the SBA emergency rulemaking authority, providing:

"Not later than 15 days after March 27, 2020, the Administrator shall issue regulations to carry

out [Title I of the CARES Act] and the amendments made [thereby] without regard to the notice

requirements under [5 U.S.C. § 553(b)]."  15 U.S.C. § 9012.

   PPP funds are generally processed on a first come, first served basis, and the funds were

exhausted quickly.  On April 24, 2020, Congress appropriated an additional $310 billion for PPP

loan guarantees.  *See* Paycheck Protection and Healthcare Enhancement Act, Pub. L. No. 116-

139, § 101(a), 134 Stat. 620 (2020).

   **C.  The Bankruptcy Exclusion**

   In the meantime, the Administrator used the emergency rulemaking authority conferred

by Congress.  On April 2, 2020, less than one week after the CARES Act was passed, the

Administrator posted an interim final rule regarding the PPP (the "First IFR") to the SBA's

website.  The First IFR explains that in order to apply, an applicant must submit SBA Form

2483, the PPP Application Form, to a lender.  Business Loan Program Temporary Changes;

Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,814 (Apr. 15, 2020) (to be codified at 13

C.F.R. pt. 120).  Among the limited PPP underwriting requirements, the First IFR includes

lender review of the borrower certifications contained in Form 2483.  Id. at 20,815.  The

Administrator also posted Form 2483 to the SBA's website on April 2, 2020.  Form 2483 states

that "if questions (1) or (2) . . . are answered 'Yes' the loan will not be approved."  [Dkt. No. 49,

---

2  The "covered period" during which a "covered loan" could be obtained was subsequently extended to
December 31, 2020.  *See* Paycheck Protection Program Flexibility Act of 2020, Pub. L. 116-142, § 3(a),
134 Stat. 641, 641 (codified at 15 U.S.C. § 636(a)(36)(A)(iii)).

¶ 17.]  Question one asks whether the applicant is "presently involved in any bankruptcy[,]"

excluding such applicants from participating in the PPP.  Id.

The agency action excluding debtors from the PPP occurred with the promulgation of the

First IFR and Form 2483, neither of which contain an explanation specifically addressing the

bankruptcy exclusion.  In a prefatory section, the First IFR observes that the "intent of the Act is

that SBA provide relief to America's small businesses expeditiously[.]"  85 Fed. Reg. 20,811,

20,812.  That prefatory section goes on to provide that:

> For . . . loans made under the PPP, SBA will not require the lenders to comply
> with section 120.150 "What are SBA's lending criteria?."  SBA will allow lenders
> to rely on certifications of the borrower in order to determine eligibility of the
> borrower . . . .  Lenders must comply with the applicable lender obligations set
> forth in this interim final rule, but will be held harmless for borrowers' failure to
> comply with program criteria; remedies for borrower violations or fraud are
> separately addressed in this interim final rule.  The program requirements of the
> PPP identified in this rule temporarily supersede any conflicting Loan Program
> Requirement (as defined in 13 C.F.R. 120.10).

85 Fed. Reg. 20,811, 20,812.  Among the lending criteria and loan program requirements

suspended as to PPP loans, but applicable to other Section 7(a) loans, is the multi-factored

analysis identified in 13 C.F.R. § 120.150, including a consideration of the applicant's credit

history, and an evaluation of any prior bankruptcy filings revealed on Form 1919.  In place of

these considerations, the SBA imposed more streamlined requirements: lender review of the

borrower certifications on Form 2483, and disqualification of certain applicants, including those

involved in an ongoing bankruptcy.

On April 24, 2020, the Administrator posted a fourth interim final rule (the "Fourth IFR")

with respect to the PPP on its website.[3]  The Fourth IFR, which has since been published in the

Federal Register, "supplements the previously posted interim final rules with additional

guidance."  Requirements—Promissory Notes, Authorizations, Affiliation, and Eligibility, 85

Fed. Reg. 23,450, 23,450 (Apr. 28, 2020) (to be codified at 13 C.F.R. pt. 120 & 121).  The rule

provides the following guidance pertinent to the bankruptcy exclusion:

### 4. Eligibility of Businesses Presently Involved in Bankruptcy Proceedings

Will I be approved for a PPP loan if my business is in bankruptcy?

No.  If the applicant or the owner of the applicant is the debtor in a bankruptcy
proceeding, either at the time it submits the application or at any time before the
loan is disbursed, the applicant is ineligible to receive a PPP loan.  If the applicant
or the owner of the applicant becomes the debtor in a bankruptcy proceeding after
submitting a PPP application but before the loan is disbursed, it is the applicant's
obligation to notify the lender and request cancellation of the application.  Failure
by the applicant to do so will be regarded as a use of PPP funds for unauthorized
purposes.

The Administrator, in consultation with the Secretary, determined that providing
PPP loans to debtors in bankruptcy would present an unacceptably high risk of an
unauthorized use of funds or non-repayment of unforgiven loans.  In addition, the
Bankruptcy Code does not require any person to make a loan or a financial
accommodation to a debtor in bankruptcy.  The Borrower Application Form for
PPP loans (SBA Form 2483) which reflects this restriction in the form of a
borrower certification, is a loan program requirement.  Lenders may rely on an
applicant's representation concerning the applicant's or an owner of the
applicant's involvement in a bankruptcy proceeding.

Id. at 23,451.

### D.  The Miller Declarations

By May and June 2020, litigation was underway in this Court and in courts across the

country concerning the legality of the bankruptcy exclusion.  In some of the cases, the

---

[3]  The Administrator also promulgated second and third interim final rules, neither of which address the
bankruptcy exclusion.  See Business Loan Program Temporary Changes; Paycheck Protection Program,
85 Fed. Reg. 20,817 (Apr. 15, 2020) (to be codified at 13 C.F.R. pt. 121); Additional Eligibility Criteria
and Requirements for Certain Pledges of Loans, 85 Fed. Reg. 21,747 (Apr. 20, 2020) (to be codified at 13
C.F.R. pt. 120).

Administrator offered declarations of its Deputy Associate Administrator for Capital Access,

John A. Miller. *See* [Dkt. No. 90, Ex. 1 & 2]. In the Maine Miller Declaration—dated June 5,

2020—Mr. Miller explains that the CARES Act was enacted on March 27, 2020 "to provide

emergency assistance" to "businesses affected by the COVID-19 emergency." [Dkt. No. 90, Ex.

1, ¶ 3.] He states that participating lenders began accepting PPP loan applications on April 3,

2020, one week after the CARES Act was passed. Id. ¶ 22. Mr. Miller also states that:

> SBA determined that the intent of the Act is that SBA provide relief to America's
> small businesses expeditiously. This intent, along with the dramatic decrease in
> economic activity nationwide, provided good cause for SBA to dispense with the
> 30-day delayed effective date provided in the Administrative Procedure Act.
> Specifically, small businesses needed to be informed on how to apply for a loan
> and the terms of the loan under section 1102 of the Act as soon as possible
> because under the CARES Act as enacted the last day to apply for and receive a
> loan was June 30, 2020. The Interim Final Rules were issue[d] to allow
> immediate [implementation] of this program.

Id. ¶ 5. When discussing the bankruptcy exclusion specifically, Mr. Miller states:

> The reason for including the bankruptcy exclusion in Form 2483 was that SBA in
> consultation with Treasury determined that in order to meet the challenges of
> rescuing the economy from the effects of the Covid-19 virus pandemic, loan
> assistance authorized by the [CARES] Act had to be provided as expeditiously as
> possible with as little as possible underwriting. Since a company in bankruptcy
> required an inquiry into the state of the proceeding and possibly a court order for
> DIP financing, as well [as] the possible resolution of a host of other issues and the
> prospect of incurring fees by the lender in monitoring the bankruptcy proceeding,
> it was determined that the wording of Form 2483 would be expeditious and less
> likely to slow the administration of the program and less likely to require the
> expenditure of additional time, effort and other resources. The purpose of a PPP
> loan is to help small businesses pay their employees and maintain operations to
> allow them to restart quickly over the next few months. *SBA decided that this
> purpose would not be served by including all bankruptcies.* Certain creditors,
> including administrative creditors, could assert claims to the PPP loan funds that
> would interfere with its authorized uses and the requirements for PPP loan
> forgiveness. SBA, in consultation with the Department of Treasury, determined
> there should be one streamlined rule that applies to all debtors in bankruptcy to
> avoid the need for case by case reviews.

Id. ¶ 17 (emphasis added).  Finally, Mr. Miller explains that other than the statute itself, the PPP

application form, and the First and Fourth IFRs, there "is no Administrative Record . . . because

this was an Interim Final Rule, prepared in order to deliver this much needed assistance to small

businesses as expeditiously as possible."  Id. ¶ 23.

The Vermont Miller Declaration—dated May 14, 2020—contains some of the same

statements as the Maine Miller Declaration.  But in the Vermont Miller Declaration, Mr. Miller

offers the following explanation for the bankruptcy exclusion:

> The purpose of a PPP loan is to help small businesses pay their employees and
> maintain operations to allow them to restart quickly over the next few months.
> *This purpose would not be served in a chapter 11 liquidation or in a chapter 7
> case.*  Certain creditors, including administrative creditors, could assert claims to
> the PPP loan funds that would interfere with its authorized uses and the
> requirements for PPP loan forgiveness.  SBA, in consultation with the Department
> of Treasury, determined there should be one streamlined rule that applies to all
> debtors in bankruptcy to avoid the need for case by case reviews.

[Dkt. No. 90, Ex. 2, ¶ 21 (emphasis added).]

With these individual pieces of the puzzle laid on the table, the focus can shift to the

larger picture: an assessment of how the bankruptcy exclusion holds up under the second step of

the Chevron analysis and the arbitrary and capricious framework articulated in State Farm.

Before adjusting to that wider lens, however, the significance of the Miller declarations looms in

the foreground.

### E.  The Significance of the Miller Declarations vis-à-vis the Administrative Record

The Hospitals contend that the Miller declarations are post hoc rationalizations that

should be ignored.  In the Hospitals' view, this is warranted because the Miller declarations were

not generated at the same time as the bankruptcy exclusion or offered at trial, and the reasons

they advance in support of the bankruptcy exclusion do not qualify as contemporaneous

explanations.  The Hospitals also contend that the reasoning in the Vermont Miller Declaration

differs from the reasoning in the Maine Miller Declaration, and that the evolution in the explanations offered over time renders them incredible.

When "reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." <u>Dep't of Commerce v. New York</u>, 139 S. Ct. 2551, 2573 (2019). Like many rules, the administrative record rule admits certain exceptions. For example, "[a] reviewing court may accept evidence outside the administrative record where there is a strong showing of bad faith or improper behavior by agency decisionmakers, or where there is a failure to explain administrative action [so] as to frustrate effective judicial review." <u>Murphy v. Comm'r of Internal Revenue</u>, 469 F.3d 27, 31 (1st Cir. 2006) (citations omitted) (quotation marks omitted). "The administrative record may be supplemented, if necessary, by affidavits, depositions, or other proof of an explanatory nature." <u>Sierra Club v. Marsh</u>, 976 F.2d 763, 772 (1st Cir. 1992) (quotation marks omitted). "The new material, however, should be explanatory of the decisionmakers' action at the time it occurred. No new rationalizations for the agency's decision should be included, and if included should be disregarded." <u>Id.</u> at 772-73 (citations omitted).

Here, there has been no showing of bad faith or improper behavior on the part of the SBA. However, given the exigencies of the Administrator's rulemaking efforts in relation to the PPP, the supplementary explanation contained in the Fourth IFR is appropriately included in the administrative record. In the extraordinary circumstances surrounding the passage of the CARES Act, and the congressional directive that the Administrator get the PPP off the ground immediately to provide economic relief to struggling businesses and their employees, the lack of a perfectly contemporaneous explanation is far from troubling. There is no suggestion that the explanation offered in the Fourth IFR is simply a "convenient litigating position" and the time-

lag between the promulgation of the bankruptcy exclusion and the Fourth IFR did not force the

Hospitals or the Court to chase a moving target.  *Cf.* Dep't of Homeland Sec. v. Regents of the

Univ. of Cal., 140 S. Ct. 1891, 1909 (2020) ("Permitting agencies to invoke belated justifications

. . . can upset the orderly functioning of the process of review, forcing both litigants and courts to

chase a moving target." (quotation marks omitted)).

The District Court determined that the Maine Miller Declaration "elaborates on and helps

to explain the Administrator's earlier stated reason for adopting the bankruptcy exclusion."

[Dkt. No. 78, p. 5.]  Specifically, the District Court observed:

> [T]he reason provided by the Administrator for enacting the bankruptcy exclusion
> rule was the need to establish a streamlined, expedited loan process reliant on
> certifications by applicants, and her determination that "providing PPP loans to
> debtors in bankruptcy would present an unacceptably high risk of an unauthorized
> use of funds or non-repayment of unforgiven loans."  Business Loan Program
> Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. at 23,451.  The
> [Maine] Miller Declaration is consistent with this view, explaining that "[c]ertain
> creditors, including administrative creditors, could assert claims to the PPP loan
> funds that would interfere with its authorized uses and the requirements for PPP
> loan forgiveness."  ECF No. 1-14 at 44.

[Dkt. No. 78, p. 5] (footnote omitted).  Because the explanation offered in the Maine Miller

Declaration is consistent with that included in the Fourth IFR, the Maine Miller Declaration

appropriately supplements the administrative record.[4]

Although the Maine Miller Declaration was not offered at trial, considerations of fairness

do not warrant exclusion here, where the Hospitals were granted a full opportunity to craft a

litigation response to the declaration on recommittal.  Before trial, the primary thrust of the

Hospitals' contentions under the APA concerned the Administrator's authority to adopt the

---

[4]  Even if the Maine Miller Declaration were excluded from consideration, the proposed disposition
would be unaffected.  This Court would still conclude, on a record consisting solely of Form 2483 and the
First and Fourth IFRs, that the bankruptcy exclusion is a reasonable construction of the statute and is
neither arbitrary nor capricious.

bankruptcy exclusion.  *See* [Dkt. No. 1].  The closest the Hospitals came to developing a State

Farm style argument was in their pretrial memorandum where they asserted that the record was

"sufficient to determine that the Administrator has acted in an arbitrary and capricious manner,

in violation of 5 U.S.C. § 706(2)(A)."  [Dkt. No. 43, ¶ 18.]  They also urged the Court to use "all

of the tools necessary to address the concerns of the Administrator" (as expressed in the Fourth

IFR) and argued that the record would not show that the Administrator "engaged in a thoughtful,

deliberative process" with respect to the bankruptcy exclusion or in "any review whatsoever of

the financial health or viability of any company seeking PPP funds."  Id.  In the proposed

findings and conclusions issued in June 2020, the Court attempted to address the arguments

developed by the parties.  Since then, the Administrator has supplemented the administrative

record with the Maine Miller Declaration, and the Hospitals, in response to that declaration, have

made new, detailed arguments under the State Farm rubric.

Among other things, this Court is tasked with resolving the "possible discrepancy"

between the Maine Miller Declaration and the Vermont Miller Declaration.  [Dkt. No. 78, p. 6.]

When discussing the bankruptcy exclusion in the Maine Miller Declaration, Mr. Miller states:

"The purpose of a PPP loan is to help small businesses pay their employees and maintain

operations to allow them to restart quickly over the next few months.  SBA decided that this

purpose would not be served by including all bankruptcies."  [Dkt. No. 90, Ex. 1, ¶ 17.]  In the

Vermont Miller Declaration, executed several weeks prior to the Maine Miller Declaration, Mr.

Miller states: "The purpose of a PPP loan is to help small businesses pay their employees and

maintain operations to allow them to restart quickly over the next few months.  This purpose

would not be served in a chapter 11 liquidation or in a chapter 7 case."  [Dkt. No. 90, Ex. 2, ¶

21.]  After these statements, both declarations state: "Certain creditors, including administrative

creditors, could assert claims to the PPP loan funds that would interfere with its authorized uses and the requirements for PPP loan forgiveness.  SBA, in consultation with the Department of Treasury, determined there should be one streamlined rule that applies to all debtors in bankruptcy to avoid the need for case by case reviews."  [Dkt. No. 90, Ex. 1, ¶ 17 & Ex. 2, ¶ 21.]

A discrepancy may be a "difference" or an "inconsistency."  *See* Webster's New World College Dictionary 392 (3d ed.).  There is no inconsistency between the Miller declarations; they are not identical, but they are not in conflict either.  Saying that the purpose of the PPP would not be served in a chapter 11 liquidation or a chapter 7 case (as Mr. Miller states in the Vermont Miller Declaration) does not imply or suggest that the purpose of the PPP would be served in other types of bankruptcy cases.  That is the inference upon which the Hospitals' inconsistency theory rests.  The statement in the Vermont Miller Declaration—that the purpose of the PPP would not be served in chapter 7 or a liquidating chapter 11—is merely a subset of the broader statement in the Maine Miller Declaration—that the purpose of the PPP would not be served by including all bankruptcies.  The difference between these two statements does not cause the Court to view the Miller declarations with any degree of skepticism.  A person might say on a Monday: "I am gluten sensitive.  I have difficulty with marble rye, so I avoid that type of bread."  Several days later, that person might say: "I am gluten sensitive.  I have difficulty with bread, and therefore avoid all bread."  A listener, hearing the more specific first statement and then the more general second statement, would not question the person's credibility simply because the statements were not identical.  In both cases, the person with the gluten sensitivity would be tying a difficult decision—the decision to avoid bread—to the sensitivity.  That same sort of reasoning appears in the Miller declarations; the distinction between the two declarations is not problematic in the way the Hospitals suggest.

### F.  The Analysis Under the Second Step of <u>Chevron</u> and <u>State Farm</u>

The District Court previously adopted this Court's proposed conclusion under the first step of <u>Chevron</u>—namely, that Congress did not explicitly say whether debtors in bankruptcy were eligible to participate in the PPP, delegating rulemaking authority on that issue to the SBA. In the second step of the <u>Chevron</u> analysis, the court considers whether the challenged agency decision "is based on a permissible construction of the statute."  <u>Chevron</u>, 467 U.S. at 843 (footnote omitted).

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation.  Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit.  In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

<u>Id.</u> at 843-44 (footnotes omitted).[5]

As the District Court stated, although the inquiry under the second step of <u>Chevron</u> may overlap somewhat with the question of whether the agency decision was arbitrary or capricious under the APA, the overlap is incomplete.  [Dkt. No. 78, p. 6 (citing <u>River St. Donuts, LLC v. Napolitano</u>, 558 F.3d 111, 117 (1st Cir. 2009)).]  At oral argument, the Hospitals signaled agreement with the District Court's view, stressing certain aspects of the APA analysis, but

---

[5]  The Hospitals did not ask the Court to apply the less deferential framework supplied by <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134 (1944).  Had such a request been made, it would have been denied.  "The <u>Chevron</u> analysis applies because Congress delegated authority to the SBA to make rules carrying the force of law and the SBA exercised that authority in issuing the [bankruptcy exclusion]."  <u>USF Fed. Credit Union v. Gateway Radiology Consultants, P.A. (In re Gateway Radiology Consultants, P.A.)</u>, --- F.3d ---, 2020 WL 7579338, at *8 n.8 (11th Cir. Dec. 22, 2020) (citing <u>United States v. Mead Corp.</u>, 533 U.S. 218, 229-30 (2001)).

indicating that their arguments under <u>Chevron</u> and the APA were basically one and the same.

For this reason, the discussion centers on the standard set forth in the text of the APA:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>   (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>   (B) contrary to constitutional right, power, privilege, or immunity;
>   (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>   (D) without observance of procedure required by law;
>   (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of [Title 5] or otherwise reviewed on the record of an agency hearing provided by statute; or
>   (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706.

The standard prescribed by section 706(2)(E) cropped up at oral argument when the Hospitals argued that the SBA is saddled with the burden of showing that the bankruptcy exclusion is supported by "substantial evidence."  For this proposition, the Hospitals cited <u>State Farm</u> and <u>Allentown Mack Sales and Serv., Inc. v. Nat'l Labor Relations Bd.</u>, 522 U.S. 359 (1998).  These decisions are not on point.  In <u>Allentown Mack</u>, the agency decision was governed by a statute separate from the APA indicating that the agency's findings of fact, if supported by substantial evidence, would be conclusive.  *See* <u>id.</u> at 377 (referencing 29 U.S.C. § 160(e)).  The agency decision also involved on-the-record factfinding, governed by 5 U.S.C. § 706(2)(E).  Similarly, in <u>State Farm</u>, the substantial evidence standard applied where "Congress required a record of the rulemaking proceedings to be compiled and submitted to a reviewing

court, 15 U.S.C. § 1394, and intended that agency findings under the [applicable statute] would be supported by substantial evidence on the record considered as a whole." State Farm, 463 U.S. at 43-44 (referencing the applicable legislative history). The bankruptcy exclusion, by contrast, was not adopted pursuant to a statute requiring the SBA to conform to the substantial evidence standard, and the rulemaking process did not involve on-the-record factfinding or a hearing under 5 U.S.C. §§ 556 or 557. Cf. 5 U.S.C. § 706(2)(E).

The Hospitals have also invoked section 706(2)(A), asserting that the SBA acted in an "arbitrary and capricious" manner in adopting the bankruptcy exclusion.[6] In 1983, the Supreme Court provided the following explication of this standard:

> The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. In reviewing that explanation, [the court] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies: [The court] may not supply a reasoned basis for the agency's action that the agency itself has not given. [The court] will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.

State Farm, 463 U.S. at 43 (citations omitted) (quotation marks omitted).

How does the bankruptcy exclusion hold up when this standard is applied? In the First IFR, the Administrator stressed that the CARES Act had been passed to provide "emergency

---

[6] Countless courts, litigants, and commentators have referred to the "arbitrary and capricious" standard. This Court will follow suit, even though a natural reading of the APA instructs the court to set aside agency action that is either arbitrary or capricious. See 5 U.S.C. § 706(2)(A) ("arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

assistance" to businesses and determined that the legislature had intended "that SBA provide

relief to America's small businesses expeditiously." 85 Fed. Reg. 20,811, 20,811.  To provide

that expeditious relief, the SBA streamlined its lending criteria and created an application

process that would allow lenders to underwrite PPP loans by relying on borrower certifications

on Form 2483, including the certification regarding bankruptcy status.  Later, in the Fourth IFR,

the Administrator again emphasized the streamlined process that permitted lenders to "rely on an

applicant's representation concerning the applicant's . . . involvement in a bankruptcy

proceeding." 85 Fed. Reg. 23,450, 23,451.  The Administrator also supplemented this need-for-

speed rationale with two other considerations:  First, the Administrator stated that, after

consulting with the Secretary of the Treasury, she had determined "that providing PPP loans to

debtors in bankruptcy would present an unacceptably high risk of an unauthorized use of funds

or non-repayment of unforgiven loans." Id.  Second, the Administrator observed that "the

Bankruptcy Code does not require any person to make a loan or a financial commitment to a

debtor in bankruptcy." Id.

As previously noted, the Maine Miller Declaration is consistent with the Fourth IFR.  In

that declaration, Mr. Miller reiterated that debtors were categorically excluded from the PPP in

order to streamline and expedite the underwriting and lending process:

> Since a company in bankruptcy required an inquiry into the state of the
> proceeding and possibly a court order for DIP financing, as well as the possible
> resolution of a host of other issues and the prospect of the incurring of fees by the
> lender in monitoring the bankruptcy proceeding, it was determined that the
> wording of Form 2483 would be expeditious and less likely to slow the
> administration of the program and less likely to require the expenditure of
> additional time, effort and other resources.

[Dkt. No. 90, Ex. 1, ¶ 17.]  Mr. Miller also elaborated on the Administrator's concerns about the

risk of "unauthorized" use of the funds or non-repayment of unforgiven loans if debtors in

bankruptcy were to participate in the PPP, explaining that "[c]ertain creditors, including

administrative creditors, could assert claims to the PPP loan funds that would interfere with its

authorized uses and the requirements for PPP loan forgiveness."  Id.  Finally, Mr. Miller stated

that purpose of the PPP—helping small businesses pay employees and maintain operations—

would not be served by including all bankruptcies in the program, and that the Administrator had

decided to apply a bright-line rule "to avoid the need for case by case reviews."  Id.

        The Fourth IFR and the Maine Miller Declaration reflect that the bankruptcy exclusion

was the product of reasoned decision making.  When deciding whether to make PPP loans

available to debtors, the Administrator appropriately looked to the CARES Act as the source of

the relevant factors.  See Brewer v. Madigan, 945 F.2d 449, 457 (1st Cir. 1991) ("The enabling

statute . . . is the principal source of relevant factors to be considered by the agency in

promulgating regulations."); see also Judulang v. Holder, 565 U.S. 42, 55 (2011) (stating, in an

APA challenge to an action by the Board of Immigration Appeals, that the BIA, tasked with

considering "relevant factors," was required to consider "the purposes of the immigration laws or

the appropriate operation of the immigration system").  These factors are identified in the

administrative record, as supplemented with the Maine Miller Declaration.  The record also

contains an explanation that provides a rational connection between the factors the Administrator

considered and the decision to exclude all debtors in bankruptcy from the PPP.

        The CARES Act and the circumstances surrounding its enactment were truly

extraordinary, and Congress clearly communicated the need for speedy action, granting the

Administrator only fifteen days to issue regulations, dispensing with the notice-and-comment

procedures that would otherwise apply to those regulations, and imposing a cut-off date for PPP

applications of June 30, 2020.  The Administrator did not err in concluding that the legislature

had tasked the SBA with administering the PPP expeditiously.  To implement this directive, the

SBA decided to streamline the lending and underwriting process, allowing lenders to rely on

borrower certifications.  The SBA further simplified the process by adopting a bright-line rule

rendering debtors in bankruptcy ineligible, obviating the need for a lender or the SBA to review

the circumstances of individual debtors and to monitor ongoing bankruptcy cases.  The

bankruptcy exclusion was based, in part, on the need for speedy loan processing communicated

by Congress.

　　　　The Hospitals resist this conclusion, asserting that there is nothing in the administrative

record—no data, facts, or studies—that explains how the process of making or guaranteeing PPP

loans would be bogged down by permitting debtors to participate.  In their view, the SBA should

have, within the fifteen-day rulemaking window, solicited input or sought an expert opinion

about how cumbersome it would have been to include debtors in bankruptcy in the PPP.  The

Hospitals assert that the administrative record should stand on its own, without any assistance

from common sense or generalized conclusions about lending in bankruptcy.  The Court

disagrees.  Because Congress dispensed with the notice-and-comment procedures prescribed by

5 U.S.C. § 553 and required the Administrator to promulgate rules within fifteen days, the Court

does not fault the SBA for failing to seek expert opinions or to conduct hearings.  These are the

sorts of activities normally undertaken during the notice-and-comment process.  *See* 5 U.S.C. §

553(c).  And, contrary to the Hospitals' beliefs, common sense can appropriately play a role in

agency rulemaking.  *See, e.g.,* ABC Aerolineas, S.A. de C.V. v. U.S. Dep't of Transp., 747 F.

App'x 856, 870 (D.C. Cir. 2018); Van Hollen v. Fed. Election Comm'n, 811 F.3d 486, 497 (D.C.

Cir. 2016).  This is especially true here, where that commonsense insight—that lending may be

more complex and risky in the bankruptcy context—is bolstered by the Administrator's apparent

awareness of the content of the United States Bankruptcy Code, specifically 11 U.S.C. § 364

(concerning the terms under which the trustee, or a debtor with powers of a trustee, may obtain

postpetition credit) and 11 U.S.C. § 365(c)(2) (prohibiting the trustee from assuming a contract

to make a loan to or for the benefit of the debtor).

The SBA also tethered the bankruptcy exclusion to a determination that there was an

"unacceptably high risk" that a debtor in bankruptcy might use PPP funds for "unauthorized

purposes" or fail to repay an unforgiven loan. 85 Fed. Reg. 23,450, 23,451. The Maine Miller

Declaration provides further insight, explaining that the SBA perceived a risk that creditors in a

bankruptcy case, including administrative creditors, could assert claims to PPP funds, interfering

with the intended uses of those funds. [Dkt. No. 90, Ex. 1, ¶ 17.] Mr. Miller also stated that the

purpose of the PPP was "to help small businesses pay their employees and maintain operations"

and that the SBA "decided that this purpose would not be served by including all bankruptcies."

Id. These statements each relate to the purpose of the PPP generally, and the intended uses of

PPP funds, more specifically. See 15 U.S.C. § 9005(b) (detailing the uses of PPP loan proceeds

that render the loan forgivable, in whole or in part). This line of reasoning also hinges on certain

generalizations about lending to debtors in bankruptcy.

The CARES Act requires all PPP applicants to certify that they are experiencing some

degree of financial distress related to the uncertainty created by COVID-19. See 15 U.S.C. §

636(a)(36)(G)(i)(I) (requiring PPP applicants to certify "that the uncertainty of current economic

conditions makes necessary the loan request to support the ongoing operations of the eligible

recipient"). This degree of financial distress is a PPP baseline. But, when it came to debtors in

bankruptcy, the SBA perceived an additional risk that PPP loan funds might not be used for their

intended purposes—e.g., to cover payroll—and might instead be gobbled up by administrative

creditors.  The SBA apparently perceived that debtors, as a group, were more likely than non-debtors to be suffering from financial distress unrelated to COVID-19 and teetering on the verge of ceasing operations.  This is a fair, commonsense generalization.

The Hospitals counter this generalization with specificity, asserting that they are, in fact, attempting to reorganize.  That is all very well, but the SBA simply did not have the luxury of considering the particulars of individual bankruptcy cases.  And many reorganizations do fail despite the debtors' best efforts.  The Bankruptcy Code provides a mechanism by which a chapter 11 reorganization may be converted to a liquidation, *see* 11 U.S.C. § 1112, in which any unencumbered assets would be distributed in accordance with the waterfall contained in 11 U.S.C. § 726.  Any PPP funds remaining with the estate upon conversion might not be used to fund payroll or other operating expenses that would render the loan forgivable, but instead could be paid to the trustee, professionals employed by the trustee, or a host of other chapter 7 administrative expenses.  Although a PPP loan might qualify for priority if obtained pursuant to an order under 11 U.S.C. § 364(b) or (c), the loan would only be repaid in a liquidation to the extent that any funds remaining with the estate were (i) unencumbered and (ii) not subject to a claim of higher priority.  Even if a PPP loan obtained administrative expense status during the chapter 11 case, if the case later converted to a chapter 7 case, the administrative expenses of the chapter 7 case would take priority over the administrative expenses of the chapter 11 case.  *See* 11 U.S.C. §§ 507(a)(2), 726(b).  The reality is that the Hospitals pose a false dichotomy:  lending to debtors who are reorganizing in chapter 11 is relatively safe and simple (and therefore those debtors should not have been excluded from the PPP) whereas lending to chapter 7 debtors and debtors liquidating in chapter 11 cases would not promote the purposes of the PPP (and therefore the SBA could have properly excluded only those debtors).  The Court does not perceive that the

24

distinction is quite so stark.[7]  If PPP funds were not used for their intended purposes and were

instead used to cover the expenses of a liquidation, the PPP loan would not be forgiven, and the

SBA would be liable on its guarantee of the unforgiven loan balance in the event of non-

payment.  The Bankruptcy Code gives rise to the prospect that a reorganization may, at any time,

become a liquidation, and liquidation would not further the purposes of the PPP.[8]  The SBA did

not err in determining that there was a risk that PPP loan proceeds might be diverted to purposes

not intended by the CARES Act in a bankruptcy case, and that the loan, if not forgiven, might

not be repaid.  The SBA did not act arbitrarily or capriciously in deciding that debtors should be

excluded from the program due to that risk.

     The Hospitals resist this conclusion too, asserting that the SBA relied on factors that

Congress did not intend the agency to consider.  The Hospitals aver that Congress removed all

underwriting criteria for the PPP, pointing to the part of the statute requiring a PPP applicant to

certify that the loan is necessary to sustain continued operations.  *See* 15 U.S.C. §

636(a)(36)(G)(i)(I).  The Hospitals further assert that Congress did not intend the SBA to

---

[7]  This conclusion is bolstered, to a limited extent, by the recent amendments to the PPP included in the Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, 134 Stat. 1182 (2020).  In that legislation, Congress amended 11 U.S.C. § 364 by adding a new subsection (g).  Pub. L. No. 116-620, § 320, 134 Stat. 1182, 2015.  Under that subsection, a bankruptcy court may authorize a trustee or a debtor in possession in three types of cases to obtain a loan under 15 U.S.C. § 636(a)(36), with such a loan to be treated as a debt to the extent the loan is not forgiven, with priority equal to a claim of the kind specified in 11 U.S.C. § 364(c)(1).  Pub. L. No. 116-620, § 320, 134 Stat. 1182, 2015.  Notably, however, this amendment is only to take effect if and when the Administrator submits to the Director of the Executive Office for the United States Trustee a determination that any such debtor would be eligible for a loan under section 636(a)(36).  Pub. L. No. 116-620, § 320, 134 Stat. 1182, 2016.  This discretion now expressly conferred on the Administrator does not extend to chapter 11 debtors generally; it applies only to subchapter V cases (which are a subset of chapter 11 cases), chapter 12 cases, and chapter 13 cases.

[8]  Although the Hospitals' chapter 11 cases could not be converted to chapter 7 without their consent, *see* 11 U.S.C. § 1112(c), the risk of reorganizational failure is not entirely obviated by their nonprofit status.  Even a chapter 11 case commenced by a nonprofit remains subject to dismissal under 11 U.S.C. § 1112(b).  The point is, not all chapter 11 reorganizations are successful.

consider an applicant's ability to repay an unforgiven PPP loan, pointing to the section of the

statute that eliminated the requirements of collateral and a personal guarantee. *See* 15 U.S.C. §

636(a)(36)(J). In the Court's view, the Hospitals read too much into these specific provisions

and too little into the other provisions of the PPP. Congress did not suspend for PPP loans the

sound value requirement generally applicable to Section 7(a) loans, and it authorized the SBA to

guarantee PPP loans on the same terms and conditions as other Section 7(a) loans, except as

otherwise provided in 15 U.S.C. § 636(a)(36). *See* id. § 636(a)(36)(B). Yes, there are

indications that the loans were to be used for forgivable purposes, but there were also statutory

provisions for unforgiven loan balances. The SBA dutifully complied with the parts of the

statute cited by the Hospitals, while continuing to impose a minimal, streamlined underwriting

standard—a targeted effort to ensure that the loans would either be forgiven or repaid. In doing

so, the SBA did not rely on factors which Congress did not intend the agency to consider.

The SBA asserts that the bankruptcy exclusion was justified as an effort to fulfill the

statutory sound value requirement. The Hospitals urge the Court to disregard this assertion for

two reasons. First, they point out that the Administrator stipulated that the SBA does not analyze

PPP applications to determine whether a loan to a particular applicant would be of sound value.

Second, the Hospitals note that the sound value requirement does not expressly surface as part of

the rationale offered in the Fourth IFR or the Maine Miller Declaration. The stipulation raised

by the Hospitals does not have the significance they ascribe to it. Instead, the stipulation simply

underscores that the SBA decided to streamline PPP loan processing. As for the Hospitals'

timeliness complaints, the Court cannot disregard the fact that sound value is a component of the

statutory PPP calculus. Stated differently, the sound value requirement is hard-wired in the

statute such that it cannot be brushed aside. When evaluating whether the SBA acted arbitrarily

and capriciously by adopting the bankruptcy exclusion, the Court is tasked with considering whether the SBA relied on factors that Congress did not intend the agency to consider. The SBA's sound value argument properly arises in this context, in response to the Hospitals' contention that Congress eliminated all underwriting requirements and did not intend the SBA to consider how PPP loan funds would be used or whether the loans would be repaid.

The Hospitals' next argument fares no better. They say that the SBA failed to consider the protections that the Bankruptcy Code might have offered to accommodate the SBA's concerns about extending PPP loans to debtors. In the Hospitals' view, these bankruptcy protections include: (a) the requirement that the debtor provide notice to interested parties prior to a hearing under 11 U.S.C. § 364; (b) a chapter 11 debtor's obligation to file monthly operating reports on the docket, thereby providing transparency about the use of PPP funds; (c) the bankruptcy court's ability to order the debtor to segregate PPP funds from other funds; (d) the court's ability to hold a debtor in contempt for unauthorized uses of PPP funds; and (e) the SBA's ability to secure a priority claim under 11 U.S.C. § 507. Perhaps these protections might have ameliorated some of the SBA's concerns about PPP lending in the bankruptcy setting. It is possible that some other rational choice might have been made in light of the SBA's concerns. But an agency is not generally required to "consider all policy alternatives in reaching a decision." State Farm, 463 U.S. at 51. The Court's task is not to second-guess, but rather to determine whether the bankruptcy exclusion was supported by adequate reasoning. *See* Chevron, 467 U.S. at 843 n.11 ("The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding."). The SBA did not act arbitrarily or capriciously by failing to consider the ways in which a PPP loan to

a debtor could have been structured.   There was nothing in the CARES Act requiring the agency

to consider these aspects of the Bankruptcy Code.   And, for the reasons already discussed, the

SBA was pursuing a streamlined process.   Invoking these bankruptcy protections would have

been far from streamlined, requiring involvement on the part of the SBA or the lender in

thousands of individual bankruptcy cases.

Finally, the Hospitals insist that there may be some (or even many) cases where a PPP

recipient outside of bankruptcy is less creditworthy than a debtor in a bankruptcy case.   They

make sweeping arguments about the how the statute should operate based on the Hospitals' own

circumstances, as if all debtors attempting to reorganize under chapter 11 have similar

circumstances.   That is simply not the case.   Yes, one could find a recipient of a PPP loan outside

of bankruptcy that is less creditworthy than the Hospitals.   That does not mean that the SBA

acted arbitrarily or capriciously when it acted quickly based on a commonsense generalization

about lending to debtors in cases under Title 11.   The Hospitals identify the problem with

generalizations: they are not universally true.   Some PPP borrowers outside of bankruptcy likely

posed greater credit risks than some debtors in bankruptcy.   But because of the pressure to

promulgate a rule that would result in expeditious lending, and because of the permissibility of

discriminating against debtors in lending under 11 U.S.C. § 525, a universal, one-size-fits-all rule

was justified, notwithstanding the shortcomings of generalized risk assessment.

## III.    FINAL CONSIDERATIONS

Although the rules promulgated by executive agencies are not immune from judicial

review, some amount of deference is generally warranted.   But how much?   Where, as here, the

challenged rule does not represent a departure from prior practice and where the agency

promulgated the challenged rule under enormous pressure and statutory deadlines, the amount of deference should be at its zenith.

The Hospitals assert that the bankruptcy exclusion does not pass the State Farm test because it is not supported by any facts, data, or evidence.  They read too much into State Farm without accounting for the significant distinctions between the rulemaking process that Congress prescribed in that case and the process prescribed here.  In State Farm, the regulation at issue was a rule requiring manufacturers to install passive restraints in vehicles to protect vehicle occupants in the event of a collision.  463 U.S. at 34.  The regulation, adopted after lengthy proceedings, required vehicle manufacturers to install either of two passive restraint devices: airbags or automatic seatbelts.  Id. at 34-37.  After the regulation was adopted, the agency determined that seatbelts would not accomplish the anticipated safety benefits because many individuals would detach them.  Id. at 38.  Based on this determination, and while continuing to acknowledge the effectiveness of airbags, the agency entirely rescinded the passive restraint requirement without considering an amendment to the regulation that would have required vehicle manufacturers to install airbags.  See id. at 46-48.  Under the circumstances, the Supreme Court deemed the rescission arbitrary and capricious, concluding that the mandatory passive restraint rule could not be abandoned without any consideration of an airbag-only requirement given the agency's determination that airbags remained cost-beneficial, life-saving technology.  Id. at 48.

Although State Farm articulates the applicable test, its holding is largely inapposite.  In State Farm, the agency action at issue was the rescission of a preexisting rule.  The statute governing the agency specifically required it to compile a record of its rulemaking proceedings, and the applicable legislative history manifested congressional intent that the agency's findings be supported by "substantial evidence."  The bankruptcy exclusion, by contrast, appeared in the

promulgation of a new rule and the statute authorizing the rule manifested the legislature's intent

that the SBA dispense with ordinary rulemaking processes and act with alacrity.

The SBA did not engage in factfinding in any typical sense. No hearings were convened,

and no studies were conducted. No statements from the public or subject matter experts were

solicited or considered. One can easily imagine the outcry that would have ensued if, following

the adoption of the CARES Act, the SBA had conducted studies or gathered statements before

promulgating the PPP application form. Under the circumstances, the Court is not troubled that

the SBA did not marshal the type of information one might ordinarily classify as "evidence"

before adopting the bankruptcy exclusion.

The Hospitals do not contest the need for the SBA to have acted quickly. They do nitpick

the manner in which the SBA reached its decision. But their real quarrel relates to the SBA's

decision on the merits, which they view as unfair and discriminatory. As for discrimination, the

Court has already determined that 11 U.S.C. § 525 does not protect the Hospitals from the sort of

discrimination that occurred here. In other words, from a bankruptcy perspective, the exclusion

of debtors from the PPP was a lawful choice. That conclusion—that section 525 is not

applicable here—bears, to a certain extent, on the fairness of the SBA's decision. Other aspects

of Title 11 also bear on the fairness of the bankruptcy exclusion. As the SBA observed, lending

to debtors (in any type of bankruptcy case) is purely voluntary: no debtor can force a lender to

make a postpetition loan. That reality reflects the nuances of lending to debtors in bankruptcy.

The viability of the bankruptcy exclusion under the APA has been extensively litigated in

bankruptcy and district courts across the country. Some courts have upheld the exclusion; others

have struck it down. In this Court's view, the bankruptcy exclusion was a reasonable choice that

cannot be fairly depicted as arbitrary or capricious. The decisions that reach the contrary

conclusion suffer from a fatal flaw; they ultimately substitute a judicial determination for that of

the SBA.  That is precisely what the Hospitals are asking the Court to do here; the ask is revealed

by the nature of the remedy requested.  For the alleged violation of the APA, the Hospitals do not

seek the ordinary remedy of remand to the agency for further investigation or new rulemaking.

Instead, they ask the Court to compel the SBA to pay to the Hospitals the full amount of the PPP

loans they were denied.

Although this Court would likely have crafted a different rule if asked to write on a blank

slate, that is not the task at hand.  Because the SBA engaged in reasoned decision making and the

bankruptcy exclusion is a permissible construction of the enabling legislation, the Court must

defer to that decision.


Date: January 12, 2021                         _____

                                               Michael A. Fagone
                                               United States Bankruptcy Judge
                                               District of Maine